W. David STEDMAN, Plaintiff,

v.

HOOGENDOORN, TALBOT, DAVIDS,
GODFREY & MILLIGAN, et al.,
Defendants.

No. 92 C 5670.

United States District Court,
N.D. Illinois, E.D.

Feb. 18, 1994.

James K. Meguerian & Ann H. Theodore, D'Ancora & Pflaum, Chicago, IL, for Stedman.

Mary Kay Scott & Dennis G. Gianopolus, Bullaro, Carton, & Stone, Chicago, IL, for Ed Willey.

George W. Spellmire & Maureen R. Lennon, Hinshaw & Culbertson, Chicago, IL, for Hoogendoorn.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Remaining defendants Hoogendoorn, Talbot, Davids, Godfrey & Milligan (a Chicago law firm referred to here as "Hoogendoorn Firm") and Edward Willey d/b/a Edward Willey Commercial Investigations ("Willey") have moved for summary judgment in this multi-count diversity-of-citizenship action brought against them by W. David Stedman ("Stedman"). Their motions target all of Stedman's claims as advanced against Hoogendoorn Firm and Willey in the Third Amended Complaint (the "Complaint"). To prepare the motions for resolution, all the parties have now complied with the requirements of Fed.R.Civ.P. ("Rule") 56 (except for fully satisfying the provisions of this District Court's implementation of that Rule in its General Rule ("GR") 12(M) and 12(N), a subject discussed briefly a bit later). For the reasons stated in this memorandum opinion and order, Hoogendoorn Firm's and Willey's motions are granted and this action is dismissed.

### Procedural Background

Initially (in late August 1992) Stedman joined with four related plaintiffs—his wife Sarah W. Stedman ("Sarah"), the W. David Stedman and Sarah White Stedman Foundation and Stedman's daughter Nancy Jane Calloway and her husband Thomas D. Calloway, Jr. (collectively "Calloways")—in the filing of an ill-thought-through (at least in procedural and jurisdictional terms) Complaint against three defendants: Hoogendoorn Firm, Willey (then named only as "Edward D. Willey Commercial Investigations") and Joseph Mahr ("Mahr," then named only as "Joseph Mahr Investigations"). This Court's prompt sua sponte August 27, 1992 memorandum opinion and order directed the attention of plaintiffs' counsel to some obvious jurisdictional flaws in the original Complaint and dismissed it, granting leave to cure those flaws via amendment.

Although the resulting Amended Complaint and a later pleading captioned "Revised Amended Complaint" did somewhat better, it quickly became clear to everyone except plaintiffs' counsel that the named plaintiffs other than Stedman himself had no place in this litigation—after all, Stedman was the only person with whom Hoogendoorn Firm had dealt and as to whom there was any reason on any defendant's part to foresee the action that Stedman took in claimed reliance on the work for which he had retained Hoogendoorn Firm. This Court so ruled orally on November 13, 1992.

Stedman's promptly-filed Second Amended Complaint dropped all of the plaintiffs other than Stedman, but that pleading too was then met with Rule 12(b)(6) motions to dismiss filed by each of the three defendants. This Court proceeded to rule on those motions orally, and on January 5, 1993 Stedman's final version of his pleading (as already stated, it is referred to here as the "Complaint" for convenience) emerged:

1. Complaint Count I charged Hoogendoorn Firm with breach of contract.

2. Count II asserted breach of contract claims against Mahr and Willey.

3. Count III charged all three defendants with negligent misrepresentation.

4. Count V (there was no Count IV) charged Hoogendoorn Firm alone with negligence—a lawyer malpractice claim. After the matter was then brought to issue (at last), summary judgment motions followed from all three defendants.

One last procedural (and substantive) step preceded the current ruling. In his response to the Hoogendoorn Firm and Willey Rule 56 motions, Stedman stated in part that "in a separate motion [he] will voluntarily dismiss Mahr as a defendant in this action." On November 29, 1993 this Court ruled orally that Mahr was entitled to more than that—

that it was unnecessary for him to wait on Stedman's voluntary action to take Mahr out of litigation that it had long been apparent was brought against him improvidently. Accordingly this Court ruled that there was no genuine issue of material fact as to Mahr and that he was entitled to a judgment as a matter of law (the Rule 56 standard). That determination was coupled with a Rule 54(b) determination of finality (see *National Metalcrafters v. McNeil*, 784 F.2d 817 (7th Cir.1986)).[1]

### Summary Judgment Standards and Documentation

· This Court regularly repeats the operative standards for dealing with Rule 56 motions. Here is its recent summarization as set out in *Donato v. Metropolitan Life Ins. Co.*, 822 F.Supp. 535, 536–37 (N.D.Ill.1993):

> Rule 56 imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 [106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265] (1986)). For that purpose a "genuine" issue does not exist unless record evidence would permit a reasonable factfinder to adopt the nonmovant's view (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986)), and only facts that would prove outcome-determinative under substantive law are "material" (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)). In both respects this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)).

No doubt because of the checkered history of the litigation, with all of its false starts, neither Hoogendoorn Firm nor Willey com-

plied fully with this District Court's GR 12(M) implementation of Rule 56. Stedman understandably then tendered no GR 12(N) submission, having nothing to which such a response could be directed. Less understandably, however, the principal part of the Appendix that Stedman filed in support of his response to the summary judgment motions (cited "Stedman App. Ex.——") consists of information that *postdated* Stedman's retainer of Hoogendoorn Firm and the ensuing investigative activity that forms the gravamen of the Complaint. Because Stedman has not been so presumptuous as to charge either defendant with the lack of a crystal ball to foresee the future, those submissions are wholly irrelevant and will of course be ignored. ·

### Facts[2]

Before March 1990 Stedman (a North Carolina resident and citizen) had the occasion to retain Hoogendoorn Firm partner Edward Tiesenga ("Tiesenga") to handle a few legal matters here in Chicago. Then on March 26, 1990 Stedman telephoned Tiesenga about Stedman's prospective purchase of some valuable rare coins from a Minneapolis (Hennepin County) dealer named Michael Blodgett ("Blodgett"), president of T.G. Morgan, Inc. ("Morgan"). Stedman told Tiesenga that he had already checked Blodgett and Morgan out in his own way and had engaged in similar business transactions with them[3] but that he wanted to check them out more carefully before buying any more coins (Stedman Dep. 12). To that end Stedman orally retained Hoogendoorn Firm (through Tiesenga) to obtain a further background investigation of Blodgett and Morgan.

There is considerable divergence between Stedman's and Tiesenga's versions of that initial conversation. Tiesenga's is considerably more detailed and is buttressed by his

---

**1.** That ruling mooted Stedman's subsequent filing (tendered later that same day) of a motion to dismiss Mahr as a defendant. And with the ensuing lapse of time having rendered the judgment in Mahr's favor nonappealable, he has become assured of the repose to which he was entitled from the beginning.

**2.** What follows in the text sets the backdrop for the ensuing discussion of Stedman's several

claims. That later discussion will recount added facts (and in some instances differing versions of the facts) that are relevant to the respective claims.

**3.** Those six or seven earlier investments (Stedman Dep. 9) amounted to nearly $4.6 million in such coins (*id.* 50–51).

contemporaneously-taken handwritten notes, while Stedman's version bears all the earmarks of a post-hoc wish-is-father-to-the-thought reconstruction (nor did Stedman make any notes, either then or thereafter, that might have reinforced either his recollection or the version that he gave during his deposition). There were material areas as to which Tiesenga was specific in his testimony, while Stedman was fuzzy or hedged his deposition responses.

■ Although to be sure a summary judgment motion is not the occasion for "weigh[ing] the evidence and determin[ing] the truth of the matter" (*Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510), the fact remains that the Rule 56 standard equates to that under Rule 50(a) (*id.* at 250–52, 106 S.Ct. at 2511–12)—and here there are portions of Stedman's testimony that are so at odds not only with Tiesenga's testimony but also with all the objective facts (and often with any notions of reasonableness) that they need not be credited for Rule 56 purposes. In that respect 10A Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil 2d* § 2727, at 170 (2d ed. 1983) quotes a statement from Judge Learned Hand as having established the principle "that the evidence offered must have the force needed to allow a jury to rely on it and the court may disregard an offer of evidence that is too incredible to be believed" (also see cases cited there and in the 1993 pocket part). Judge Hand's statement (and that of Wright, Miller & Kane) of course preceded *Anderson*, which stated the Rule 56 and Rule 50(a) inquiry in somewhat less demanding terms: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law" (477 U.S. at 251–52, 106 S.Ct. at 2511–12). This opinion applies that standard.

For example, Tiesenga was very explicit that Stedman imposed an express 72-hour time limit within which the investigation had to be completed (garnering as much information as was possible within that period), because that was the time frame within which Stedman said he had to make his new investment decision (Tiesenga Dep. 17–19).[4] In sharp contrast, Stedman waffled on the subject in his deposition, conceding only that "[i]t's quite possible that" he imposed such a time limit (Stedman Dep. 22). Under those circumstances this Court is entirely justified in crediting Tiesenga's version, and it does so.

On a closely related subject, Tiesenga swore that he responded to Stedman's tight deadline by saying that he would have to use a private investigator to conduct the investigation (Tiesenga Dep. 19). Tiesenga's recollection is that Stedman then asked how much that would cost, that Tiesenga responded that it should be possible for "[s]omewhere in the ballpark of $500 . . . to fund an investigator who can devote a great deal of time to it between now and 72 hours," and that Stedman then authorized the use of an investigator in that range of cost (*id.*).[5] But Stedman's testimony sought to paint a different picture—that he expected Tiesenga to perform the investigation himself (Stedman Dep. 19), though he conceded that he didn't *ask* Tiesenga to do so (*id.*). Later Stedman backpedaled from that statement in a meaningful way by saying (in response to questions about Willey's written report) that he "looked to Mr. Tiesenga and Hoogendoorn to do—to handle that, *to choose the people, if they chose them*" (*id.* at 60, emphasis added).

Here too the required favorable inferences cannot aid Stedman. After all, he was hiring a Chicago lawyer and not a Minneapolis lawyer to do the work of investigating a Minneapolis individual and his company on a crash basis. If Stedman had been calling a Minne-

---

4. There is no question that Tiesenga came away from the telephone conversation with that understanding, for he relayed that urgency to Willey (Willey Dep. 14–15) and Willey conducted his investigation and generated his report on exactly that timetable of a 72-hour limitation, measured from the original Stedman–Tiesenga conversation.

5. Again that version is corroborated by what Tiesenga actually *did* after the initial conversation, as well as by Stedman's later receipt of Willey's report and his payment to cover Willey's bill without raising any question.

apolis lawyer, his story of imposing an obligation on the lawyer to do the work in person could have been plausible. But the circumstances here put the lie to any suggestion of that sort.[6] Especially in light of Stedman's current insistence that the key information he wanted was as to any criminal record of Blodgett and his company—information that could be obtained only by an onsite examination of Hennepin County records—Stedman's obvious effort to do reconstructive surgery to historical fact must be rejected. Again it is Tiesenga's version of the conversation that properly forms part of the factual matrix for the current motions.

Consistently with that conversation and with Stedman's extremely short timetable, Tiesenga immediately telephoned Mahr, a private investigator operating in Hinsdale, Illinois with whom Hoogendoorn had previously done business. Mahr did not have the time to conduct the inquiry, so he referred Tiesenga to Willey, a private investigator based in northern Wisconsin—more precisely in Sayner, Wisconsin. Willey accepted the time-limited assignment when Tiesenga telephoned him in the afternoon of March 26 (though by then an entire working day of the three-day time frame had elapsed). At 5:30 p.m. on March 26 Tiesenga faxed Willey a letter confirming the nature of the assignment and containing all of the information that Stedman had given to Tiesenga (Willey Dep.Ex. 1). Here is how that letter described the investigatory assignment:

> Our objective is to determine whether Blodgett, his company (Morgan) or any other company or affiliate has any negative history such as a bankruptcy, civil or criminal investigation, litigation, or conviction of any kind.

During the next two days Willey covered a great deal of ground (metaphorically, not literally, for his investigative procedures involve a good deal of sophisticated electronic information-gathering in preference to on-site activity). In the course of his investigation Willey reported his findings back to Tiesenga, who in turn passed the information along to Stedman by fax on March 27, by phone on March 28 and then again by fax on March 29. Excerpts from the text of the two faxes (both of which are Exhibits to the Complaint) are set out in more detail in the course of the later discussion. For the moment, however, it is fair to summarize that the reports contained numerous reservations in terms of incomplete data as well as some very substantial "red flag" warning signs, though Willey had not uncovered any express incriminating evidence as to Blodgett or Morgan.

After being apprised of the results of the investigation, Stedman elected to ignore the warnings that he had been given (including Tiesenga's orally expressed misgivings, as to which Stedman—clearly a person of strong views—considered Tiesenga as overstepping the bounds of his responsibility) and to proceed with the investment. Stedman made substantial additional purchases of rare coins from Blodgett and Morgan, both for his own account and for the account of other members of his family: his daughters Sarah Elizabeth Stedman ("Sarah") and Ann Louise Stedman ("Anne") as well as the Calloways.[7] Stedman borrowed funds to finance the purchases from financial institutions under the condition that Stedman would act as guarantor, backing Calloways' loan in part and the loans to Stedman's other two daughters in full.

---

6. At one point North Carolinian Stedman appeared to reflect the proverbial easterner's view of the midwest—in speaking of why he called on Tiesenga for the Blodgett assignment to begin with, he spoke of the other work that Tiesenga had done for him and then went on (Stedman Dep. 98, emphasis added):

> I knew him, and *he was in this part of the country.*

Unfortunately the following page (Dep. 99) is the only one that is missing out of the 100–page Stedman deposition that the litigants submitted to this Court. But it appears from the quoted language that Stedman (as the *Chicago Tribune* sometimes does) must perceive Minnesota's Twin Cities as part of "Chicagoland."

7. These were the 1990 purchases, entered into by Stedman on behalf of the listed persons:

 April 4—Anne, $435,885
 April 10—Stedman, $27,990
 April 13—Stedman, $447,450
 May 24—Stedman, $692,385
 June 1—Stedman and Sarah, $571,115
 August 8—Calloways, $618,090
 August 31—Stedman, $225,700

It turned out that the strong warnings by both Willey and Tiesenga (both of whom had suspected that Blodgett might be working a scam) were dead right and that Stedman—who thought that he knew better—was dead wrong. Blodgett's representations proved to have been false, and the coins that Stedman purchased for himself and his clan were in reality worth but a fraction of their cost. It also turned out that although both the Minnesota State Police Bureau of Criminal Investigation and the Minnesota Attorney General's Office had given Blodgett a clean bill of health in response to Willey's inquiries, Hennepin County records that Willey had not sought to search (more on this subject later) would have provided adverse information. Those records (which were later obtained by an investigator that Stedman hired to dig into the matter after the investment turned sour) reveal that in August 1984 Blodgett had been accused of four felony charges described as "theft by swindle of $2,500." Stedman's later investigator also obtained a statement by an investigator for the Hennepin County Attorney's Office describing Blodgett's modus operandi as involving the falsification of sales contracts to acquire bogus sales commissions from his then employer. At Blodgett's sentencing hearing (a transcript of which was also part of the public record) he confessed and entered into a plea bargain under which he pleaded guilty to a reduced charge, served a 12-month probationary period and agreed to repay his ex-employer $30,150.60 in restitution (Stedman App.Ex. 8).

In this action Stedman seeks to use that conviction as the springboard for shifting the entire loss from his ill-considered investment to Hoogendoorn and Willey. To do so he falsely portrays the sole focus of the investigation that he asked Tiesenga to arrange for as directed to Blodgett's criminal record. As Stedman portrays the matter, the presence or absence of such a record was the only on-off switch for his $3 million investment—his simplistic statement of the causal nexus is essentially:

Criminal record equals no investment, while no criminal record equals investment (despite all of the other danger signals that were sounded by Tiesenga and Willey but were ignored by Stedman).

But the extreme nature of that contention on Stedman's part (one that is at such substantial odds with the facts) does not excuse the need to analyze his claims one by one. This opinion turns to that task.

### Breach of Contract Claims

■ Stedman launches a breach of contract claim against each defendant. Count I alleges that Hoogendoorn Firm breached its contract with Stedman—one that (as already indicated) Stedman labels solely as an undertaking to investigate Blodgett's criminal background, while Count II avers that Willey breached his own separate contract with Hoogendoorn—an agreement upon which Stedman seeks to recover as a third-party beneficiary (Complaint ¶ 25). Elements essential to a cause of action for breach of contract under Illinois law[8] are (1) the existence of a valid and enforceable contract containing both definite and certain terms; (2) performance by the plaintiff; (3) breach of the contract by the defendant; (4) resultant injury to the plaintiff—that is, damages resulting from the breach (*Nielsen v. United Serv. Auto. Ass'n*, 244 Ill.App.3d 658, 662, 183 Ill.Dec. 874, 877, 612 N.E.2d 526, 529 (2d Dist.1993); *Mannion v. Stallings & Co.*, 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990)).

### Count I—Hoogendoorn Firm

■ Hoogendoorn Firm's Rule 56 motion (Mem. 3–11) centers in principal part on what it obviously considers to be the weakest link in Stedman's position—what it labels his failure to show that the alleged breach was a proximate cause of Stedman's damages. This opinion will later review whether "proximate cause" is an appropriate rubric for that argument, but at the outset this Court addresses a fatal flaw in Stedman's contract

---

**8.** In diversity cases such as this one "where the parties fail to consider the choice of law ..., the substantive law of the forum is presumed to control" (*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 n. 33 (7th Cir.1986)). Here the parties have focused on Illinois law, and this opinion does the same.

claim that is suggested only obliquely by Hoogendoorn Firm's legal discussion: Stedman's total failure to establish a breach of Hoogendoorn Firm's contractual undertaking to begin with.

What after all did Tiesenga undertake to do for Stedman? It has already been said that Stedman has attempted to gloss over that subject by reframing Hoogendoorn Firm's agreement as one limited to determining whether or not Blodgett or Morgan had any criminal history—a restructuring under which Hoogendoorn Firm would become an insurer or guarantor for Stedman's investment if it provided the wrong answer to that question. But in fact the task that Stedman imposed on Tiesenga (and hence on Hoogendoorn Firm) was a very different one: It was for them to *cause* the investigation (whose scope will be expanded upon a bit later) to be done within the required time frame.

It will be remembered that Tiesenga made it plain to Stedman that the nature of the investigation and the exceedingly limited time allowed made it necessary that the work be done by a private investigator—not by lawyers sitting in Chicago—and that Stedman had then authorized that to be done. *That* was Hoogendoorn Firm's contractual undertaking, and it was fully performed without breach. Willey (like any private investigator in like circumstances) was an independent contractor: Tiesenga did not purport to, nor in the nature of the assignment was he qualified to, dictate how Willey was to go about the investigation. Instead Tiesenga properly defined its scope (in the already-quoted Willey Dep.Ex. 1 fax letter) and left it to Willey to execute the assignment. And when Willey reported the results of his work to Tiesenga, Tiesenga immediately relayed them to Stedman.

Tiesenga was fully faithful to his task. Nothing suggests that he violated his duty in selecting Willey (not only was there nothing to put Tiesenga on notice as to any lack of qualifications on Willey's part, but the uncontroverted evidence is that he *was* fully qualified). Nor did Tiesenga fail to relay to Stedman, nor did he delay in relaying to Stedman, anything and everything that Willey reported. And as for the things that Tiesenga communicated to Stedman on his own—matters bearing on the risks involved in what Stedman was proposing to do by investing with Blodgett—those were entirely accurate, more accurate than Stedman's own decision to ignore those risks and to regard Tiesenga as presumptuous for having raised them.

Only one potential breach of contract claim could conceivably be advanced against Hoogendoorn Firm, and that claim would have to involve the Firm's somehow being vicariously responsible for any error that was made by Willey. But in the nature of things that theory would necessitate the Firm's having undertaken to insure Stedman against that eventuality—just as untenable a framing of the parties' relationship as it would be to hold that the Firm had undertaken to insure the success of Stedman's investment decision against his own poor judgment in making it.

So it is that Stedman's breach of contract claim against Hoogendoorn Firm founders at the very first step—the failure to lay any breach at its doorstep. But because Hoogendoorn Firm has devoted the bulk of its discussion to what it characterizes as a lack of showing of "proximate cause" (by which it means the absence of damages resulting to Stedman from the claimed breach, thus missing the fourth essential component of a breach of contract claim as identified in *Nielsen* and *Mannion*), and because that same lack-of-causal-relationship factor bears on Stedman's other claims against Hoogendoorn Firm and all his claims against Willey as well, this opinion will go on to that subject. Here is how Hoogendoorn Firm R.Mem. 2 frames its position in that respect:

> The issue before this Court is whether the information provided to the plaintiff by the defendants could have a [sic] proximately caused him to invest in the rare coin market or put another way, whether he justifiably relied on the information provided to him by the defendants in going forward with his investments in the rare coin market. Defendant asserts that plaintiff was provided with information in the plaintiff's 72 hour deadline which would have prevented a reasonable person from going

forward with the type of investment contemplated by the plaintiff.

"Proximate cause" is of course a tort concept, not transferable as such to contract disputes (not surprisingly, Hoogendoorn Firm cites no contract cases in support of its argument). But if the underlying premise of the argument is sound, this Court need not be put off by the tyranny of labels. And indeed the point that Hoogendoorn Firm is making—that given everything else that Stedman knew, it was *his* unreasonable decision to proceed rather than the single missing item of information that caused his damages (in the analogous tort context, the notion of an independent intervening cause— see *Cannon v. Commonwealth Edison Co.*, 250 Ill.App.3d 379, 381, 190 Ill.Dec. 183, 185, 621 N.E.2d 52, 54 (1st Dist.1993) and cases cited there)—has a proper place in the law of contracts as well: see *Feldstein v. Guinan*, 148 Ill.App.3d 610, 613, 101 Ill.Dec. 947, 949, 499 N.E.2d 535, 537 (1st Dist.1986) (damages that are not the proximate result of a breach of contract are not recoverable).[9]

This opinion turns then to consider whether Stedman's decision to proceed against all the admonitions that he received was an independent factor that broke the claimed nexus between any asserted contractual breach and the damages caused by the ill-fated investments. As already suggested, Tiesenga's and Willey's reports to Stedman were rife with warnings. And this opinion's ensuing particularization of those warnings demonstrates that both the oral and written transmissions to Stedman were so negative in identifying the risks involved that Stedman's decision to proceed anyway must be considered as his own deliberate assumption of those risks. Under such circumstances defendants are correct that mulcting *them* in damages would be wholly inappropriate.

To begin with, Tiesenga's brief threshold report, contained in his March 27 fax letter, cautioned as to the limited positive readings that had been obtained by that initial date:

> However, this preliminary judgment on Blodgett and his company is based on minimal evidence entitling it to little weight at this point.

But once the in-depth information became available, it would be an understatement to say that the messages turned strongly negative. Thus Tiesenga's March 29 fax letter (which transmitted Willey's detailed investigative reports) contained some of his own caveats—for example:

> It sounds very suspicious that someone would be willing to give you monthly statements of value increases in coins. The very nature of the market in valuables (very expensive, very small) goes against the ability of anyone to calibrate increases in value so finely, and so often—especially when he did a grand total of only $32 million last year (at your level of purchase, only you and 31 other people—hardly much of a "market").

And that letter went on to summarize some knowledge that Tiesenga had garnered from an antique dealer in New Hampshire (as chance would have it, his father-in-law) who was familiar with the market for coins. That summary put its finger directly on the potential for fraud implicit in Blodgett's scheme (a warning that turned out to be right on the money, to make a bad pun):

> 1. Companies like Kidder and Merrill Lynch have had rare coin funds for at least 7 to 8 years, so this is nothing new.
>
> 2. The effect of these funds is to create a "false market" for the coins, inflating their value beyond a reasonable market value.[10]

---

9. That notion of the close linkup that must exist between a contract breach and the damages recoverable for that breach also underlies the familiar doctrine of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854) and its numerous progeny—see, e.g., *Edward E. Gillen Co. v. City of Lake Forest*, 221 Ill.App.3d 5, 12, 163 Ill.Dec. 585, 589, 581 N.E.2d 739, 743 (2d Dist.1991) and cases cited there; *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 957–58 (7th Cir.1982)).

10. [Footnote by this Court] Another of Tiesenga's own transmissions that accompanied his letter was an excerpt from a work discussing "Tulipmania"—an obvious effort to caution Stedman about the parallel between the artificial inflation of coin prices and what had happened centuries ago when the bubble burst and collapsed the wildly inflated prices that had marked the Dutch tulip craze. Stedman's reaction, even carrying over to the time of his deposition in this case, was one of resentment—he obviously believed

As might have been expected, Willey's reports enclosed with Tiesenga's March 29 fax provided more particularized danger signals about the contemplated investments. For one thing, Blodgett was a member of the American Numismatics Association (a "distinction" that was available to anyone willing to pay a $22 fee), but he was *not* a member of the Professional Numismatics Association ("PNA"), which Willey identified as "THE organization for professional coin dealers." As Willey reported, PNA demands a $1,000 initiation fee and conducts background investigations of all applicants—thus Blodgett's nonmembership alone should certainly have provided Stedman with substantial reason for pause. And that was strongly reinforced by the advice given Willey by his contact at the PNA, Paul Coppenhaver ("Coppenhaver"):

> Mr. Coppenhaver advised using extreme caution when investing in the rare coin market....

> He also advised to be extremely careful when purchasing any rare coins certified under the "new" "MS 60" grading system as this system rarely reflects actual market values of coins but rather tends to state inflated and unrealistic values.

> Mr. Coppenhaver also cautioned against making any purchase wherein the purchaser was under a "time limit" schedule to invest.[11]

Willey's chain of referrals also led him to coin dealer Fred Steward ("Steward") "as an expert on the coin market and it's [sic] grading systems." Steward concurred in Coppenhaver's warnings about the concept that Blodgett was touting to Stedman:

> Steward was very familiar with the current grading systems in the rare coin industry. The two nationally accepted standards are the PCGS and NGC Systems. As to the new "MS 60" grading system, Steward explained it as follows:

> There is a very weak and soft current market in rare U.S. Coins and the banks

and lending institutions have tightened credit on dealers in that industry. In an effort to "recapitalize" their companys [sic], some dealers have devised the new grading system which substantially inflates a coin's value well above realistic market values. Allegedly, demonstrable potential buyers are produced by these dealers claiming to have markets for coins at the MS 60 graded values. The new investor buys in at MS 60 graded prices expecting heavy appreciation in value because he believes he is actually buying at the PCGS and NGC graded prices. When it comes time to sell his investment in coins in the forseeable [sic] future, the investor finds that his collection is worth as little as 20% of his original purchase value.

> Steward indicated that it was a standard part of the sales presentation of these dealers to advise the potential investor that he or she MUST get in NOW on the "ground floor" while there are still values out there to be had under the old, (soon to be outdated), grading systems.

Steward also knew of Blodgett as a "high roller"—"Someone who would do anything that was marginally within the law to make a dollar."

Those things are most but not all of the red flags that were transmitted to Stedman in documentary form. And those negative assessments were hammered home orally as well. Thus Tiesenga's notes from his conversation with Stedman reflect this warning:

> If time limit was imposed by Blodgett, would recommend against it. All contacts also said don't do it if time pressure came from Morgan. But if Stedman wants to be a risk taker, so be it.

Finally, the documents delivered to Stedman were also peppered with statements to the effect that further information would be forthcoming if Stedman so desired. Among other things, the report by Willey—who was unabashedly negative about the subject of

---

that Tiesenga had his nerve in trying to tell Stedman what to do. But Stedman is not entitled to have his hubris rewarded by sloughing off the consequent losses onto either Hoogendoorn Firm or Willey.

11. [Footnote by this Court] That warning about time limitations was echoed to Willey by Mike Letauneau of the Minnesota Department of Commerce, the agency that licenses anyone seeking to manage investments for Minnesota residents.

the investigation and who believed that he had headed off what he viewed as a senselessly risky investment[12]—concluded:

> It was ... felt that the information obtained up to this point in the investigation should be sufficient for the desired purposes and there was no wish to add any unnecessary expenses.
>
> Our agency would be happy to conduct any further investigation requested.

In sum, this Court has already held that Stedman's contract claim against Hoogendoorn Firm must fail for lack of any showing of a breach on the Firm's part. But even if it were otherwise—even if the omission of Blodgett's prior criminal record from the investigative report were somehow ascribed to Hoogendoorn Firm, despite the fact that it was not responsible for that aspect of the investigation—Stedman still could not prevail on that claim. That is, assume arguendo that for purposes of the current motions Stedman must be credited in asserting that his affirmative decision to invest with Blodgett would have been reversed if Stedman had been provided the incremental piece of information about Blodgett's five-year-old guilty plea to having schemed to obtain bogus sales commissions from his then employer. Even so, it must be considered as a matter of law that Stedman's affirmative decision to invest—reached in the face of so many adverse signals—cannot be held reasonable. In biblical terms, it was unreasonable as a matter of law for Stedman to have swallowed a camel and to profess to strain at a gnat.

That conclusion would serve as an independent basis—if one were needed—for granting summary judgment on Count I (see, in the analogous tort context, *McCoy v. McCoy,* 227 Ill.App.3d 244, 248, 169 Ill.Dec. 244, 247–48, 591 N.E.2d 124, 127–28 (4th Dist.1992)). Or

to return to the area of contract doctrine, Stedman's having invested despite the many warnings produced by Willey's brief investigation[13] can be viewed as a total failure on Stedman's part to mitigate any damages otherwise claimed to be attributable to the nonreporting of the criminal matter in Blodgett's past (see *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1144 (7th Cir.1985) (tort doctrine of avoidable consequences is the counterpart to the contract-law duty to mitigate damages)). Stedman's investment and the consequent losses were the direct result of his reckless decision to ignore the abundant red flags raised by the investigation. That being so, it would not be equitable to hold Hoogendoorn Firm liable for the loss (cf. *McCoy,* 227 Ill.App.3d at 248, 169 Ill.Dec. at 248, 591 N.E.2d at 128, holding that the lack of proximate cause may be an appropriate subject for summary judgment).

*Count II—Willey*

■ What has just been said about Stedman's recklessness also suffices to insulate Willey from any breach-of-contract liability as a matter of law. That is, even if Willey were to be tagged with a breach of *his* contractual undertaking (which is a somewhat different matter from the one examined at the beginning of the discussion about Hoogendoorn Firm), Stedman's damages flowed not from that possible breach but from his own stubbornness in failing to heed the ample warnings that he was given—mostly by Willey.

That could well end the discussion right here. But out of respect to the other issues raised by the parties, this opinion goes on to treat with them as well.

For one thing, with Willey too (just as he did with Hoogendoorn Firm) Stedman seeks to cast a misleading light on just what the contractual undertaking was. Under Sted-

---

**12.** When Willey described the Blodgett "new" grading system to Tiesenga on the telephone on March 28, he said (Tiesenga Dep. 46):

> Can be as much as five times value of coin. Trying to sell people on it. Pretty much a scam. There's no ground floor here. Probably just a bag of air.

**13.** It should have been said before now that the objective reader must be impressed by the work product that was generated by Willey during the

pressure-packed time frame he was given to do the job. It drew on numerous reliable sources and gave every indication of thoroughness, including inquiries directed to key sources as to any criminal history. And as to the one base that hindsight shows was arguably not covered by Willey, the later discussion explains his reason (based on his own experience with Minnesota investigations) for proceeding as he did.

man's current version the sole assignment that was involved was to learn the Blodgett–Morgan criminal record. But in fact the background information that Stedman himself furnished to Tiesenga at the start (including Blodgett's bank account numbers and his accountant's name), coupled with the nature of the assignment from Stedman as Tiesenga promptly relayed it to Willey, points to a much broader scope of inquiry. Hence whether any claimed breach was material (and was hence actionable) would have to be tested against that far larger perspective, rather than against the narrow focus Stedman attempts to portray.

In those terms Willey's performance was more than substantial, including an extraordinarily thorough inquiry into the business aspects of the matter (in light of the time constraints under which he was working) and including—in the criminal-record area—the already described inquiries directed to the state officials. As for Willey's claimed delinquency in failing to uncover the Hennepin County information, it is well to remember not only the limited time that he had available for the *total* inquiry (just two working days by the time that the matter got into Willey's hands) but also the approximately $500 ceiling under which Willey was operating—both of those factors scarcely supporting a short-term trek to the Hennepin County courthouse. And there was more reason than that to proceed as Willey did, based on his own experience in seeking to get criminal records in Minnesota (Willey Dep. 65–67):

A. Minnesota is a particular—ladies, if you'll forgive the characterization, I'm sorry—but it's a bastard state, in our opinion anyway as investigators.

It hangs on the privacy laws that they have over there to such an extent as to make it nearly impossible to obtain criminal records without releases from the subject of the inquiry, without submissions in writing, and then going through the process of—basically it is termed a fee process where you send a written request with your fee for the record search, with a signed release from the individual.

And, in fact, I had tried on a number of occasions in the past, because of our pre-employment screening which was rather heavy at the time, to get criminal histories out of Minnesota. And that was one of the key criterias we advertised, to do a pre-employment search.

And I had been rebuffed at every turn both by law enforcement agencies and by court clerks and what have you.

And our understanding through US Datalink was that we could get felony records only in county searches, and they had to be individual searches.

They had to be in five year increments, and we had to have a release. That was spelled out in writing with US Datalink.

So it was something that—really I had no reasonable expectation that I could get it without a release from Mr. Blodgett, first of all.[14]

Under all the circumstances, it would really stretch matters to find that Willey's single reporting omission was a material breach. Overall, Willey's investigation more than successfully accomplished what he had contracted to do. Stedman never disputes (as he cannot) that Willey's written report brought to light numerous potential pitfalls, the tone and character of which more than sufficed to communicate the high risks of investing in Blodgett's questionable venture (having all the indicia of a scam). Moreover, Willey testified to several phone conversations during which he orally convinced both Mahr (Willey Dep. 42–43) and later Tiesenga (*id.* 43, 51–52) that investing with Blodgett would be extraordinarily ill-advised. Tiesenga

---

14. [Footnote by this Court] Stedman counters Willey's version by tendering the affidavit and report of William Behnke ("Behnke"), an investigator hired by Stedman to conduct a criminal check on Blodgett in August 1992 (Stedman App. Ex. A). There is no way to know whether Behnke's ability to get the information about Blodgett's 1984 record may have been the result of an easing of the Minnesota constraints in the intervening period of more than two years. It is also worth nothing that while Behnke states that his much more limited investigation took only about four or five hours, that was "exclusive of travel." Given the far broader scope of Willey's assignment, it would indeed have been unreasonable to expect him to have devoted such a high proportion of his limited hours to traveling to the Hennepin County courthouse.

passed that judgment, along with his own to the same effect, to Stedman (Tiesenga Dep. 49). Only Stedman disagreed—and he, not Willey, should pay the price of that disagreement.

There is still another problem confronting Stedman's contract claim against Willey, one that Stedman did not have to face as to Hoogendoorn Firm: the question whether Stedman was an intended third-party beneficiary of the contract between Hoogendoorn Firm and Willey.[15] In that respect *Nikolic v. Seidenberg,* 242 Ill.App.3d 96, 100–01, 182 Ill.Dec. 753, 757, 610 N.E.2d 177, 180 (2d Dist.1993) and the cases cited there exemplify Illinois law's strong presumption that parties to a contract intend it to apply only to themselves, so that third parties ordinarily acquire no rights by virtue of a contract executed by others:

> To overcome that presumption, the intent to benefit a third party must affirmatively appear from the language of the instrument considering the entire contract and the circumstances surrounding the parties at the time of its execution.

Further, the intended benefit must be direct rather than merely incidental (*Cahill v. Eastern Benefit Sys., Inc.,* 236 Ill.App.3d 517, 520, 177 Ill.Dec. 718, 721, 603 N.E.2d 788, 791 (1st Dist.1992), citing the seminal decision in *Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 257, 178 N.E. 498, 501 (1931)).

Here of course Stedman faces an especially difficult problem because of his inability to point to express language in a written agreement (*155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.,* 209 Ill.App.3d 631, 646, 154 Ill.Dec. 365, 374, 568 N.E.2d 365, 374 (1st Dist.1991); *B.C. v. J.C. Penney Co.,* 205 Ill.App.3d 5, 15–16, 150 Ill.Dec. 3, 10, 562 N.E.2d 533, 540 (1st Dist.1990); *Ball Corp. v. Bohlin Building Corp.,* 187 Ill. App.3d 175, 177, 134 Ill.Dec. 823, 825, 543 N.E.2d 106, 108 (1st Dist.1989))—there was none. It is unclear whether that inability is fatal to his claim, as those cases appear to suggest—but even if not, Stedman has not shown that the circumstances surrounding Willey's and Hoogendoorn's entry into their oral contract manifested the affirmative intent to benefit Stedman directly rather than incidentally (*Slate Printing Co. v. Metro Envelope Co.,* 532 F.Supp. 431, 433 (N.D.Ill. 1982)).

Indeed, Stedman's own effort to distance himself from Willey (Stedman Dep. 59–60) cuts against his current attempt to do otherwise:

> Q. Okay. When you received this report [Willey's], you did not know who had generated it, correct?

> A. No. And it was not important to me.

> Q. Okay. Did you ever subsequently learn who generated the report that is attached to the [Tiesenga] March 27th, 1990, letter?

> A. Who generated these reports is not important to me. I looked to Mr. Tiesenga and Hoogendoorn to do—to handle that, to choose the people, if they chose them, and I looked at Hoofendoorn [sic].

Thus Stedman himself structured the relationship between the parties so that he would receive the fruits of any investigation exclusively from Tiesenga, not from Tiesenga's subcontractor. That being so, Stedman fails for the same reasons that this Court set out in *Slate Printing,* 532 F.Supp. at 433–34 (citations omitted):

> Certainly there was no such express declaration [of intended third-party beneficiary status] in this case. Nor were the circumstances of the Allied–Slate agreement such as to overcome the "strong presumption." Illinois cases that have reached the opposite result typically involve fact situations [where] contracting parties were obviously establishing jural relationships that deliberately went beyond their own to encompass third-party rights.

---

**15.** This opinion will not pause over Willey's unpersuasive contention that his contract was with Mahr rather than with Hoogendoorn Firm, so that Stedman would at best have to establish fourth-party-beneficiary liability. Nor need any time be spent over the fact that Willey never knew Stedman's name—something that is not a precondition to third-party beneficiary status (*Weil, Freiburg & Thomas v. Sara Lee Corp.,* 218 Ill.App.3d 383, 393, 160 Ill.Dec. 773, 781, 577 N.E.2d 1344, 1352 (1st Dist.1991)).

By contrast Metro can assert only that Allied knew, when it contracted with Slate, that someone would appear farther up the chain of supply—and that someone turned out to be Metro. That has never been enough under Illinois law to be viewed as "direct" rather than "indirect" benefit for third-party beneficiary purposes. It is no different in kind or degree from the typical owner-contractor-subcontractor situation, in which the Illinois courts consistently refuse to afford the owner third-party beneficiary rights against the subcontractor for claims like those Metro makes here. Every commercial transaction between businesses in a supplier-manufacturer relationship involves the provision of supplies with express or understood specifications. Whenever those supplies are incorporated into an end product (with or without further processing), other businesses in the supply chain derive "benefit." But such benefit is classically viewed as "indirect"—as not vesting a directly enforceable right—absent some special expression by the original parties that they intended a different result. That was lacking here.

And so Stedman's Count II claim also loses for more than one reason. It is time, then, to turn to his remaining claims—all of them sounding in tort.

*Negligent Misrepresentation Claims*

 Stedman's Count III ¶ 31 alleges that each of the defendants supplied him with "incomplete inaccurate and/or false information for Stedman's guidance in his investment and business decisions." Although ordinarily "[a]n aggrieved party cannot recover purely economic loss in a tort action," an exception has been carved out for negligent misrepresentations made by those defendants "in the business of supplying information for the guidance of others" (*Mulliken v. Lewis,* 245 Ill.App.3d 512, 518, 185 Ill.Dec. 730, 734, 615 N.E.2d 25, 29 (4th Dist.1993), citing *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 88–89, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982)). Negligent misrepresentation entails "the breach of a duty to use care in obtaining and communicating information upon which others may reasonably be expected to rely in the conduct of their economic affairs" (*Stewart v. Thrasher,*

242 Ill.App.3d 10, 13–14, 182 Ill.Dec. 930, 933, 610 N.E.2d 799, 802 (4th Dist.1993)). Its essential elements include (1) the existence of a duty owed by defendant to plaintiff, (2) a breach of that duty and (3) injury proximately resulting from that breach (*Cahill,* 236 Ill.App.3d at 521, 177 Ill.Dec. at 722, 603 N.E.2d at 792), and plaintiff must demonstrate actual reliance as well (*id.*). "Misrepresentation" need not necessarily involve false information—it may also be the "failure to provide adequate information when there is a duty to provide such information" (*id.*).

It should be said at the outset that this opinion's extensive earlier discussion of the lack of causal nexus between the complained-of omission and Stedman's losses applies with at least equal vigor here. Importation of proximate cause concepts into the sphere of contract law required an extra analytical step—the drawing of an analogy. But the need to establish a proximate causal relationship is integral to every tort claim, and negligent misrepresentation is no exception. Thus the uncontroverted showing that Stedman's decision to ignore the abundant warnings was the independent intervening cause of his losses dooms any such claim against both defendants (see *Cannon,* 250 Ill.App.3d at 381, 190 Ill.Dec. at 185, 621 N.E.2d at 54) and makes summary judgment appropriate in favor of each of them (*McCoy,* 227 Ill. App.3d at 248, 169 Ill.Dec. at 248, 591 N.E.2d at 128).

· But even apart from that fatal flaw, the negligent misrepresentation claim by Stedman is without substantive merit as to each defendant. To begin with, all of the information that *was* furnished to Stedman (and there was plenty) was accurate in every detail. None was false in any respect. And as for the claimed sin of omission rater than commission—the failure to provide Stedman with the one piece of information that could be derived only from a trip to the Hennepin County courthouse—it is important to observe that Hoogendoorn Firm and Willey cannot be thrown into the same hopper. Accordingly they will be examined separately.

As for Hoogendoorn Firm, no basis whatever has been shown that would even suggest negligence on its part—how was Tiesenga to know that the reports obtained by Willey from the Minnesota state authorities as to

the lack of any criminal record on Blodgett's part did not constitute the complete and all-encompassing information on that score? There is no suggestion (nor can there be one) that Tiesenga had any obligation to conduct an independent investigation of Willey's thoroughness of doing his work in that respect. All that Tiesenga properly did was to transmit Willey's work product to Stedman. So any such claim of negligence against Hoogendoorn Firm is scotched at the very beginning.

As for Willey, it is true (as *Cahill* teaches) that the "failure to provide adequate information when there is a duty to provide such information" may also be actionable as negligent misrepresentation. But first a violation of the duty of care—negligence—must be shown, and this opinion has earlier adverted to Willey's reasons for having proceeded as he did without any effort to search out information that his experience had taught him was unavailable under the circumstances confronting him. It is difficult to find (though it is perhaps arguable) that an issue for the factfinder could be teased out of that facet of a negligent misrepresentation claim.

But Stedman also faces difficulties in charging Willey with a duty that ran to him and not just to Hoogendoorn Firm. It will be recalled that Stedman failed on that score (based in material part on his own characterization of the relationships) on his contract claim. And in the context of this specific tort, *Cahill,* 236 Ill.App.3d at 521–22, 177 Ill.Dec. at 722–23, 603 N.E.2d at 792–93 held that there was no basis for a negligent misrepresentation claim brought by an insured where the allegedly deficient information was supplied not directly to that person but instead to the agent's principal ("An agent . . . is not liable for injuries to third persons resulting solely from a mere breach of duty which he owes his principal, unless, at the same time the agent owes a separate duty to the third party"). Though Willey was an independent contractor rather than an agent, the principle is identical: Because Willey owed Stedman no duty, summary judgment in his favor is called for on this ground as well.[16]

Finally as to whether there was a "failure to provide *adequate* information," we are returned once more to the refrain so often sounded in this opinion. It is really disingenuous for Stedman to contend as he does that the abundant information that *was* furnished to him was not "adequate" to dissuade him—to say as does his Mem. 11 (quoting his Dep. 63–64) that "[b]ased on such references, Stedman reasonably concluded that the pertinent records had been checked and that there was no evidence showing that Blodgett was other than 'a fine Christian gentleman.'" Indeed the next sentence at his Mem. 11—"Nothing in the written or oral reports provided by defendants reasonably served to alter this impression"—creates wonderment as to whether Stedman listened to Tiesenga[17] or read Willey's report at all.

If the message has not gotten through to Stedman by now (which may be possible, given the stubbornness with which he rejected sound advice and plunged ahead with the Blodgett investment despite all the warning signs), perhaps it never will: He and no one

---

**16.** Indeed, given the fact that Willey communicated only with Tiesenga and not with Stedman directly, it is bizarre in the extreme for Stedman to charge Willey with negligent misrepresentation in the face of this kind of warning (Willey Dep. 61, describing a phone conversation that took place on either March 28 or 29):

I can remember telling Mr. Tiesenga, "Look, this looks for all the world based on my experience like some type of scam or con. I can't say that in my report because I don't have enough hard evidence to tell you that it is. But, you know, it sure looks extremely suspicious based on my many years on law enforcement and private investigation."

**17.** Tiesenga's Dep. 51–52, 56, 65–66 summarized his conversations with Stedman:

I then went through the rest of the notes [summarizing the points in Willey's report], told him that everyone had said, "Don't do this. Do not buy anything from anybody if there's a time limit on it. . . ."

I told him about Fred Stewart, who called Blodgett a high-roller, willing to do anything to make a buck. I told him that Stewart had said this is a scam and that Mr. Willey thought it was probably a scam.

\* \* \* \* \* \*

And I felt like I had been pounding on the negative points of this investment; I thought perhaps so much that I was going beyond a professional relation, that I was maybe insult-

else must pay the price of that pigheadedness. One of the most famous con men of another era, Yellow Kid Weil, summed up the reasons for his success in essentially this fashion:

> I never conned anyone who didn't have a little larceny in his own heart.

That was his hyperbolic way of saying that he banked on human greed—the desire to make easy money—to cause his "marks" to persuade themselves to take the bait that he threw out. Or to put it another way, if a deal looks too good to be true, it isn't true. Stedman refused to heed that warning, and his "fine Christian gentleman" responded by trying to assist Stedman's chances of attaining eternal bliss at the cost of some suffering here on earth.[18]

In short, Stedman's Count III goes the way of his other claims. It too fails as a matter of law for more than one reason.

### Hoogendoorn Firm's Claimed Negligence

██ Stedman's final claim sounds in legal malpractice—his Count V ¶ 38 asserts that Hoogendoorn breached its duty to exercise "the applicable professional standard of care." That type of claim comprises four familiar elements (*Beastall v. Madson*, 235 Ill.App.3d 95, 100, 175 Ill.Dec. 865, 869, 600 N.E.2d 1323, 1327 (3d Dist.1992), citing *Pelham v. Griesheimer*, 92 Ill.2d 13, 18, 64 Ill.Dec. 544, 546, 440 N.E.2d 96, 98 (1982)):

> (1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission that breached that duty; (3) proximate cause that establishes that but for the attorney's negligence, plaintiff would not have suffered an injury; and, (4) damages.

None of the parties devotes any real consideration to that tag-end claim—no case law

is presented other than those setting out the elements of the cause of action. Suffice it to say that what has already been said as to Stedman's negligent misrepresentation claim also demonstrates the poverty of this final claim. Stedman unquestionably fails on each of the middle two elements—he has shown neither any arguable negligence on the part of Hoogendoorn Firm nor the necessary proximate causal relationship between any claimed delinquency on its part and Stedman's losses.

### Conclusion

There is no genuine issue of material fact, and each of Hoogendoorn Firm and Willey is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

ing him by telling him how stupid I thought this was.

 \* \* \* \* \* \*

Mr. Stedman seemed in the conversation to be going point by point through my March 19 [sic—obviously should be "29"] letter, and he seemed to be trying to shoot down every possible point I had made, which is why I wrote "sounds like he's sold on Blodgett."

There seemed to be nothing you could say to Mr. Stedman that would deter him from this....

**18.** Christ himself was quoted as saying (Matthew 18:24):

> It is easier for a camel to pass through the eye of a needle, than for a rich man to enter the kingdom of heaven.

It seems that Blodgett was doing his best, as a fine Christian gentleman, to make Stedman no longer a rich man—or at least less of one.