61 F.3d 906
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
W. David STEDMAN, Plaintiff-Appellant,
v.
HOOGENDOORN, TALBOT, DAVIDS, GODFREY & MILLIGAN, P.C.,
Illinois partnership, and Edward D. Willey, d/b/a
Edward D. Willey Investigations,
Defendants-Appellees.
 No. 94-1587.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 26, 1994.
Decided July 20, 1995.
Rehearing Denied Sept. 8, 1995.
 
 Before GOODWIN,* COFFEY and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 W. David Stedman appeals from the district court's order in this diversity action granting summary judgment in favor of the defendants on his claims for breach of contract, negligent misrepresentation, and legal malpractice. See Stedman v. Hoogendoorn, Talbot, Davids, Godfrey & Milligan, 843 F. Supp. 1512 (N.D. Ill. 1994). We vacate the judgment and remand for further proceedings.
 
 I.
 
 2
 On March 26, 1990, Stedman retained attorney Edward Tiesenga of the Chicago law firm of Hoogendoorn, Talbot, Davids, Godfrey & Milligan, P.C. for the purpose of performing a background check on Michael W. Blodgett, a dealer in rare coins, and Blodgett's company, T.G. Morgan Inc. ("Morgan"). Stedman had previously made coin purchases through Blodgett totalling $4.6 million in late 1989 and early 1990, and he planned to make further substantial purchases. Before he did so, however, he wished to learn more about Blodgett and Morgan. After doing some investigation on his own, Stedman turned to Tiesenga, who had performed work for him in the past.
 
 
 3
 Stedman and Tiesenga have offered accounts of the law firm's assignment that differ in material respects. Tiesenga recalled clearly that Stedman imposed a 72-hour time limit on the investigation, explaining that he was required to make his investment decision within this amount of time. Tiesenga Dep. 18-19. Stedman could not specifically recall imposing this time limit, but conceded that it was "quite possible" that he did impose such a limit; it was consistent with his management style, and he had done so hundreds if not thousands of times when making assignments. Stedman Dep. 21-22; see also id. at 97-98. Because Stedman has not denied Tiesenga's representation that a time limit was imposed, we shall, like the district court, assume that Tiesenga and his firm were given the 72-hour limit. See 843 F. Supp. at 1515; cf. Posey v. Skyline Corp., 702 F.2d 102, 105-06 (7th Cir.) (in face of defendant's unequivocal assertion that notices were posted, plaintiff's statement that he did not recall seeing notices insufficient to establish a material dispute of fact as to whether notices were, in fact, posted), cert. denied, 464 U.S. 960, 104 S. Ct. 392 (1983).
 
 
 4
 In other respects, however, the two men's accounts differ to a degree that cannot be resolved on summary judgment. In particular, Tiesenga insists he advised Stedman that his firm would have to hire a private investigator to conduct the investigation. Tiesenga Dep. 19, 29. Indeed, Tiesenga recalls discussing the anticipated expense of doing so and receiving Stedman's permission to spend up to the $500 Tiesenga estimated it would cost. Id. at 19. Stedman denies giving Tiesenga permission to hire an investigator (Stedman Dep. 85); he simply assumed the firm itself would conduct the investigation, although he conceded the firm might choose individuals to assist in the process (id. at 19, 60).
 
 
 5
 Tiesenga contacted Joseph Mahr, a local investigator with whom his firm had done business in the past. Mahr (who did not have the time to conduct the investigation) referred Tiesenga to Edward D. Willey, an investigator located in northern Wisconsin who accepted the engagement. In the early evening of March 26, Tiesenga faxed Willey a letter confirming the nature of the assignment:
 
 
 6
 Our objective is to determine whether Blodgett, his company (Morgan) or any other company or affiliate has any negative history such as a bankruptcy, civil or criminal investigation, litigation, or conviction of any kind.
 
 
 7
 Willey Dep. Ex. 1. Armed with addresses, bank account numbers and certain other information regarding Blodgett that Stedman had provided to Tiesenga, Willey proceeded with the investigation by telephone and computer. Willey provided interim updates and a final report to Tiesenga within the 72-hour time limit. Tiesenga passed the data along to Stedman by telephone and fax together with some additional information he gathered on his own.
 
 
 8
 On March 27, 1990, Tiesenga faxed a letter to Stedman containing the following preliminary assessment of Blodgett and his company:
 
 
 9
 After making preliminary inquiries, and before completing checks with the data bases of the Federal Government, Securities and Exchange Commission, and State of Minnesota, our initial reading on Blodgett is positive. T.G. Morgan Inc. also looks positive. However, this preliminary judgment on Blodgett and his company is based on minimal evidence, entitling it to little weight at this point. We can say, at this point, however, that our opinion of his background is off to a good start.
 
 
 10
 Since at least the middle 1980's Blodgett has lived in Long Lake, Minnesota in the same house, with a mortgage of nearly $300,000. That kind of a mortgage in that part of the country says this is a substantial home. Prior to living at this residence, Blodgett had two more addresses also in Long Lake (so he hasn't been run out of town yet).
 
 
 11
 Blodgett is also current on his loan for his top-of-the-line Mercedes and has paid everything else current, including his account at the local Target store, which he opened in 1972.
 
 
 12
 His employer is listed as Harty Elving Associates, a name we have not yet been able to track down. This seems a little strange for someone who is obviously self-employed. Another potential warning signal is that three other people have checked Blodgett's credit record this year, and several checks were also made last year. This could indicate that Blodgett is looking for a lot of money, and that he started looking recently. We don't know for sure.
 
 
 13
 As for his company, we don't have much on that yet, beyond satisfactory payment records for somewhat ordinary trade payables. We should have more on the company within a day or two.
 
 
 14
 In addition to this investigation, depending on the sort of involvement you are contemplating with Blodgett, if you have not already done so, you may want to give some thought to structuring your transaction or investment with him to give you some protection beyond the protection of having a life insurance policy on Blodgett.[2] We can talk more about that later if you wish, and in the meantime we will continue our investigation.
 
 
 15
 Willey Dep. Ex. 7.
 
 
 16
 Two days later, on March 29, Tiesenga faxed the following letter to Stedman regarding the coin market generally:
 
 
 17
 Following our discussion the evening of March 28,[3] I checked with two more people concerning the type of investment you are looking at with Blodgett.
 
 
 18
 First, I checked with one of my partners here in the firm, who has recently been involved in the sale of $22 million of art work (paintings, sculptures) through the offices of Christies (international showings followed by auction in New York). Based on the relationship this partner has with the appraisers at Christies, he said two things:
 
 
 19
 1. If you would like to double check the price quotes Blodgett is giving you, we can phone our appraiser and probably get a pretty good idea. Our experience with Christies has been that they have been accurate to within 5% of the market price of a basket of goods, although their appraisals of individual items can vary more widely from actual sale price. They specialize in individual items valued at over $1 million.
 
 
 20
 2. It sounds very suspicious that someone would be willing to give you monthly statements of value increases in coins.[4] The nature of the market in valuables (very expensive, very small) goes against the ability of anyone to calibrate increases in value so finely, and so often -- especially when he did a grand total of only $32 million last year (at your level of purchase, only you and 31 other people -- hardly much of a "market").
 
 
 21
 I also called an antique dealer in New Hampshire who is familiar with coins, stamps, and a variety of other valuable items, including dishes, toys, and American memorabilia. He has also worked with the New York auction houses[.] [H]is comments are summarized below:
 
 
 22
 1. Companies like Kidder and Merrill Lynch have had rare coin funds for at least 7 to 8 years, so this is nothing new.
 
 
 23
 2. The effect of these funds is to create a "false market" for the coins, inflating their value beyond a reasonable market value.
 
 
 24
 3. Watch out if you are being told that once the coins are graded, they must be encased in plastic, and that the value cannot be guaranteed if the plastic is broken.
 
 
 25
 4. The same thing was tried with a new grading system for diamonds a number of years ago, and the perpetrators of that system were found to be putting blue gem stones under plastic, which they claimed could not be opened without destroying the value.
 
 
 26
 5. Blodgett is known within collector circles, and his name is seen in certain specialty publications and there is not necessarily a positive or negative reputation attaching to Blodgett at this point.
 
 
 27
 If you would like me to follow up any further with either of these two sources, please let me know. The formal investigators reports are attached, as well as an excerpt from a larger work discussing "Tulipmania!"
 
 
 28
 Tiesenga Dep. Ex. 2. Willey's final written report, which Tiesenga forwarded to Stedman on March 29, contained the following pertinent information:
 
 
 29
 1. No search was performed by the Securities and Exchange Commission, as the S.E.C. does not have jurisdiction over rare coin dealers.
 
 
 30
 2. The Federal Trade Commission had no record on Morgan because it was not a publicly traded corporation. The FTC revealed that it was investigating a Minnesota rare coin dealer by the name of William J. Ulrich for fraud. Although Ulrich operated from the same Minnesota town as Blodgett, the FTC knew of no connection between Ulrich and Blodgett or Morgan.
 
 
 31
 3. Blodgett had no personal judgments or pending civil actions of record. His mortgage, auto loan, and credit card accounts were all current.
 
 
 32
 4. A check with the Minnesota State Police, Bureau of Criminal Investigations, disclosed no record on Blodgett and no record of any investigation or complaint with respect to Morgan.
 
 
 33
 5. A check with the Minnesota Attorney General's office apparently revealed no adverse information regarding Blodgett or Morgan. A check did uncover a Minneapolis-St. Paul telephone for Morgan and a second company (apparently an undisclosed subsidiary) listed at that same number.
 
 
 34
 6. In an effort to determine whether there was any connection between Blodgett and Ulrich, the subject of the FTC investigation, Willey placed a pretextual call to the telephone number obtained from the Attorney General's office and asked for Ulrich. In short order Wiley was put through to Blodgett, who indicated that Ulrich was associated with an entirely different company and had no connection with Morgan.
 
 
 35
 7. A check with the Better Business Bureau revealed no complaints of record against either Blodgett or Morgan.
 
 
 36
 8. Although Blodgett was a member of the American Numismatics Association, neither he nor Morgan was a member of the premier organization of professional coin dealers, the Professional Numismatics Association, which charges an annual membership fee of $1,000 and performs a background check on all applicants.
 
 
 37
 9. The individual Willey contacted at the Professional Numismatics Association, Paul Coppenhaver, advised using "extreme caution" in the rare coin market, especially "when purchasing any rare coins certified under the 'new' 'MS 60' grading system as this system rarely reflects actual market values of coins but rather tends to state inflated and unrealistic values." Coppenhaver also advised caution when the prospective purchaser was given a time limit within which to invest by the dealer.
 
 
 38
 10. An investigator at the Minnesota Department of Commerce repeated Coppenhaver's advice to be careful when any time limits were placed on the prospective investment.
 
 
 39
 11. Fred Steward, of Capital City Coins, was familiar with both Blodgett and Morgan:
 
 
 40
 Mr. Steward ... described Blodgett as a "high roller." He went on to describe two other area coin and investment dealers with the same term. When asked his definition of a "high roller", Mr. Steward replied: "Someone who would do anything that was marginally within the law to make a dollar".
 
 
 41
 Steward was very familiar with the current grading systems in the rare coin industry. The two nationally accepted standards are the PCGS and NGC Systems. As to the new "MS 60" grading system, Steward explained as follows:
 
 
 42
 There is a very weak and soft current market in rare U.S. Coins and the banks and lending institutions have tightened credit on dealers in that industry. In an effort to "re-capitalize" their compan[ie]s, some dealers have devised the new grading system which substantially inflates a coin's value well above realistic market values. Allegedly, demonstrable potential buyers are produced by these dealers claiming to have markets for coins at the MS 60 graded values. The new investor buys in at MS 60 graded prices expecting heavy appreciation in value because he believes he is actually buying at the PCGS and NGC graded prices. When it comes time to sell his investment in coins in the foreseeable future, the investor finds that his collection is worth as little as 20% of his original purchase value.
 
 
 43
 Steward indicated that it was a standard part of the sales presentation of these dealers to advise the potential investor that he or she MUST get in NOW on the "ground floor" while there are still values out there to be had under the old (soon to be outdated), grading systems.
 
 
 44
 Willey Dep. Ex. 3.
 
 
 45
 As Stedman concedes, the reports supplied by Tiesenga and Willey included a number of warnings about the risks of investing in the rare coin market. But, construing the reports as a "neutral to positive" read on Blodgett and Morgan (Stedman Dep. 27), Stedman decided to make the additional purchases anyway. Over the next five months, Stedman invested over $3 million in rare coins purchased through Blodgett.[5] Unfortunately, the coins Stedman purchased were worth far less than he paid for them, and Stedman lost most of the money he had invested. The authorities ultimately discovered that Blodgett had defrauded some 250 customers of approximately $25 million. Blodgett was eventually convicted on charges of mail fraud, wire fraud, and the interstate transportation of stolen goods and ordered to serve seventy-eight months in prison. See Susan E. Peterson, Wayzata rare-coin dealer gets 6 1/2 year prison term, ordered to pay $500,000, Star Tribune, Oct. 22, 1993, at 7B; Susan E. Peterson, Wayzata rare-coin dealer convicted of bilking 250 investors of over $25 million in fraud scheme; Blodgett, of firm T.G. Morgan, found guilty on 18 counts, Star Tribune, June 3, 1993, at 1D.
 
 
 46
 Stedman attributes his ill-fated decision to invest in the coins to Willey and the Hoogendoorn firm, and he seeks to hold them both liable for breach of contract in failing to conduct a more thorough investigation into Blodgett's background and for negligent misrepresentation as to Blodgett's criminal history. He also seeks to hold the Hoogendoorn firm liable for malpractice. As it turns out, Hennepin County, Minnesota court records that Willey did not attempt to search in the course of his investigation would have yielded significant negative information about Blodgett, including multiple charges in 1984 of "theft by swindle of $2,500." An investigator that Stedman hired in 1992 (more than two years after he made the losing investment) located these records within four or five hours (exclusive of travel). The Hennepin County Attorney indicated that the charges arose from sales contracts that Blodgett had falsified in order to obtain commissions from his employer at the time. Blodgett had ultimately pled guilty to a reduced charge, agreed to pay the employer over $30,000 in restitution, and was placed on probation. See R. 88. Had he been aware of Blodgett's criminal background, Stedman asserts, he would never have purchased the rare coins from Blodgett.
 
 
 47
 The district court granted summary judgment in favor of the defendants. 843 F. Supp. 1512. At the outset, the court found incredible Stedman's representation that he had asked for an investigation focused principally on the criminal history of Blodgett and Morgan. See id. at 1517, 1521-22. Based on the breadth of the information about Blodgett that Stedman had provided to Tiesenga (including Blodgett's bank account numbers and his accountant's name), as well as the confirmation letter that Tiesenga had sent to Willey directing him to look for "any negative history such as a bankruptcy, civil or criminal investigation, litigation, or conviction of any kind," the court concluded that Stedman had actually requested a far broader background check. Id. at 1522. Thus, the materiality of any omissions in what Willey and Tiesenga unearthed concerning Blodgett's criminal background would have to be judged in that context, rather than against the narrower assignment Stedman claimed to have given Tiesenga. Id.
 
 
 48
 A more fundamental problem that the court discerned in each of Stedman's claims was the lack of any harm caused by the failure to check more thoroughly into Blodgett's criminal history, given the risks Willey and Tiesenga did identify in the investment. The reports that the defendants gave to Stedman "were rife with warnings," the district court emphasized. Id. at 1519. Tiesenga and Willey had noted the "suspicious" nature of Blodgett's apparent promise to provide monthly statements of value; the inflationary effects of the false market created by coin funds; Blodgett's absence from the membership rolls of the more prestigious organization of numismatics; the dramatic overstatement of coin values by dealers using the new MS 60 rating system; the red flag raised by any time limit imposed by the dealer; and Blodgett's reputation as a "high roller." Id. at 1519-20. Consequently, even if the Hoogendoorn firm and/or Willey breached a contractual or a professional duty in failing to uncover Blodgett's criminal record, or they were guilty of negligently misrepresenting his background, the warnings they did provide about the riskiness of the investment were sufficient to have dissuaded the reasonable person from investing. In other words, "it must be considered as a matter of law that Stedman's affirmative decision to invest -- reached in the face of so many adverse signals -- cannot be held reasonable." Id. at 1521.
 
 
 49
 The court detected other defects in each of the claims. As to the breach of contract claim against the Hoogendoorn firm, the court determined that the firm's undertaking was to hire a private investigator to conduct the investigation. Tiesenga had done that, he had faithfully reported what information Willey discovered, he had even gathered some information about the risk of the investment on his own; and all of the information he had conveyed to Stedman was accurate. The only scenario under which Tiesenga and his firm might be liable for breach of contract, the district court reasoned, would be one in which the Hoogendoorn firm had undertaken to insure the adequacy of Willey's investigation, and it had not. Willey, in the court's view, was an independent contractor, and the law firm's sole agreement was to hire him and report his results, nothing more. Thus, the firm had breached no aspect of its limited contractual duty to Stedman. Id. at 1518.
 
 
 50
 As to Willey, the court again observed that the scope of the investigation he undertook was significantly more broad that Stedman now asserted. Stedman claimed that the focus of the investigation he asked for was to be on Blodgett's criminal history, but the district court found this to be a "false[] portray[al]" of the probe he in fact sought. Id. at 1517.
 
 
 51
 [I]n fact the background information that Stedman himself furnished to Tiesenga at the start (including Blodgett's bank account numbers and his accountant's name), coupled with the nature of the assignment from Stedman as Tiesenga promptly relayed it to Willey, points to a much broader scope of inquiry. Hence whether any claimed breach was material (and was hence actionable) would have to be tested against that far larger perspective, rather than against the narrow focus Stedman attempts to portray.
 
 
 52
 Id. at 1522. Given the breadth of the investigation that Stedman asked for and the time and cost limits that Stedman imposed, the court found the record sufficient to preclude the notion that Willey committed a material breach of any contractual duty he might have owed to Stedman. At his deposition, Willey testified that Minnesota privacy laws made it extraordinarily difficult to search state criminal records. Thus, his failure to check these records was understandable in view of the limits imposed on his investigation, the court reasoned. Id. Although the investigator Stedman later hired had managed to uncover Blodgett's criminal history in Hennepin County court records within four to five hours, the court observed that there was no way to know whether this was due to some intervening relaxation of Minnesota laws; moreover, Stedman's investigator had noted that this time estimate was exclusive of travel -- and a trip to Minnesota was not something Willey reasonably could have accomplished within the parameters of his assignment. Id. n.14. Again, the court emphasized, Willey's written report as well as his telephone conversations with Tiesenga (which Tiesenga in turn reported to Stedman) communicated the risks of the investment with Blodgett in strong enough terms that the responsibility for Stedman's loss must be attributed to his own judgment rather than to any omission in Willey's investigation. Id. at 1522-23.
 
 
 53
 In any case, the court went on, Stedman did not hire Willey, Tiesenga did; and Stedman could not establish that he was a third-party beneficiary of the agreement between Tiesenga and Willey. Illinois cases mandate a strong presumption that the parties to a contract intend for it to apply to no one but themselves, and in the court's view, the record simply did not give Stedman any hope of overcoming this presumption. The engagement letter Tiesenga sent to Willey had no express language reflecting an intent to confer a benefit upon Stedman. Nor did the surrounding circumstances, as the court saw them. Stedman himself had testified that he did not know and did not care who had generated the final report Tiesenga had forwarded to him: "Who generated these reports is not important to me. I looked to Mr. Tiesenga and Hoogendoorn to do -- to handle that, to choose the people, if they chose them, and I looked at Hoofendoorn [sic]." Stedman Dep. 59-60. Stedman was unable to show anything more than Willey's mere knowledge that the results of his investigation would be passed on to Tiesenga's client[6], and that was insufficient to distinguish his responsibility from any commercial supplier who understands that his product will benefit another farther up in the chain of supply. 843 F. Supp. at 1523-24.
 
 
 54
 These observations largely disposed of the remaining claims as well. The negligent misrepresentation claim against Hoogendoorn failed because the court saw no negligence on the firm's part. Again, as the court saw it, Hoogendoorn's obligations were discharged in hiring Willey and reporting the results of his investigation; the firm had no knowledge of what Willey failed to check and had assumed no duty to investigate on its own. Id. at 1524-25. And as to Willey, it was simply not plausible to say that he had performed negligently given the limited amount of time and money he was permitted to expend and the apparent obstacles in the path of further inquiry into Blodgett's criminal history. In any event, the court reiterated, Willey's duty was to Tiesenga; he owed no duty of care to Willey. Id. at 1525. Finally, the malpractice claim against the Hoogendoorn firm failed for lack of evidence that the firm had conducted itself in a negligent fashion and that its omissions, if any, were a cause of harm to Stedman. Id. at 1526.
 
 II.
 
 55
 It is, of course, our obligation to review the district court's grant of summary judgment de novo. E.g., Jones v. City of Gary, Indiana, No. 94-2673, 1995 WL 372939, at * 3 (7th Cir. June 22, 1995). In doing so, we must view the record and all reasonable inferences that may be drawn from it in the light most favorable to the non-movant, Stedman. DeLuca v. Winer Indus., Inc., 53 F.3d 793, 796 (7th Cir. 1995). "Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Rand v. CF Indus., Inc., 42 F.3d 1139, 1144 (7th Cir. 1994) (quoting Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993)). The court's sole task in deciding a summary judgment motion is to determine, on the record before it, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986); 10 Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure: Civil, Sec. 2712, at 574-78 (2d ed. 1983.) "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.
 
 
 56
 We have recounted the district court's reasoning at some length to make clear the bases for the district court's conclusion that both defendants were entitled to summary judgment on each of the claims Stedman asserts against them. Given our conviction that certain material factual matters are the subject of genuine factual dispute, however, our own analysis will be brief.
 
 A. The Cause of Stedman's Loss
 
 57
 A recurrent theme in the district court's summary judgment ruling is that there could have been no harm in any omission of Blodgett's criminal history from the reports Willey and Tiesenga gave Stedman because those reports adequately apprised Stedman of the risks associated with the investment that Stedman made. The district court assumed that the very risk factors of which the defendants apprised Stedman -- including the possibility that the represented worth of the coins would be significantly greater than their actual value -- were the source of Stedman's loss. Thus, the court noted that "the strong warnings by both Willey and Tiesenga (both of whom had suspected that Blodgett might be working a scam) were dead right and ... Stedman -- who thought that he knew better -- was dead wrong." 843 F. Supp. at 1517.
 
 
 58
 Yet, we find in the record no confirmation that the particular warnings Tiesenga and Willey gave Stedman were, in fact, "dead right" as to what actually transpired between Stedman and Blodgett. We agree that if, in fact, Stedman's loss resulted from the false market created by type of coin funds Tiesenga had identified in his March 29 letter to Stedman or by the MS 60 grading system referred to in Willey's report, then indeed the defendants had placed Stedman on notice of the risks that he was undertaking in the investment. On the other hand, if the loss was due not to either of these pitfalls or any other risk inherent in the market for rare coins, but to a distinct fraud committed by Blodgett and his company of a kind the defendants had not anticipated, then we are not confident based on the record before us that the defendants did alert Stedman to the risks that materialized into his loss. Ultimately, the defendants provided Stedman with little information suggesting that Blodgett, in particular, might defraud him.[7] True, Willey did pass on another dealer's impression that Blodgett was a "high roller," willing to do anything to turn a profit so long as it was marginally within the law. Presumably, however, Blodgett did not confine himself within the boundaries of the law in this instance, even marginally, or he would not be serving time in a federal penitentiary.
 
 
 59
 Both Willey and Tiesenga also admonished Stedman to beware dealers who imposed time limits on their customer's investment decisions. Again, the district court seems to have assumed this is exactly the kind of pressure tactic that Blodgett employed on Stedman. See 843 F. Supp. at 1520-21. This could ultimately be correct as to the first series of coins Stedman purchased in early April 1990, after the investigation was completed. Tiesenga recalls Stedman explaining that the investigation had to be completed within 72 hours because he had a limited amount of time within which to invest. Tiesenga Dep. 19, 29, 48-55. It might be reasonable for the factfinder to infer that this time limit originated with Blodgett, as opposed to Stedman himself, but the record as it stands does not permit that determination. Although Stedman acknowledged that Blodgett was encouraging him to make further purchases and get in on the "ground floor" of the coin market (Stedman Dep. 23), he emphasized that Blodgett "was always promoting, he was always pushing" (id.) and that his behavior in March of 1990 was no different than it had been always been. More to the point, Stedman specifically denied that Blodgett had given him any time limit within which to invest (id. at 22, 87) and that he had ever given Tiesenga this impression (id. at 30). That dispute aside, recall that after the investigation was completed, Stedman proceeded to make purchases over the next five months, a circumstance that suggests he was not pressured by Blodgett to invest immediately, at least beyond his first purchase in April. Thus, to the extent that pressure tactics like time limits -- which are, after all, commonly used by both legitimate and illegitimate salespeople -- can be harbingers of fraud, it is not evident that Blodgett in fact imposed a limit on Stedman or that if he attempted to do so, the tactic had anything to do with Stedman's decision to invest.
 
 
 60
 Likewise, we note that Tiesenga in his March 29 letter to Stedman voiced concern about Blodgett's purported ability to gauge the monthly increases in the value of the coins Stedman would purchase. Tiesenga Dep. Ex. 2. Our perusal of the press accounts concerning Blodgett's conviction suggest that the types of monthly statements Blodgett had been sending to Stedman showing huge increases in the coins he had already purchased were, in fact, a key aspect of the fraud that Blodgett worked on Stedman and his other customers. See the articles cited at page 10, supra. Yet again, however, we must resort to speculation, for the exact nature and cause of Stedman's loss has not been fleshed out on this record.
 
 
 61
 In short, until the cause of Stedman's loss has been determined, it is premature to attribute that loss to the very risks of which the defendants apprised Stedman. As the parties seeking summary judgment, the defendants bore the burden of demonstrating that there was no genuine factual dispute as to this material question; they did not carry that burden in this instance. It may well be, as the district court believed, that Tiesenga and Willey had singled out aspects of Blodgett's modus operandi that foretold of the fraud to which Stedman would succumb; and if so, any omissions in their investigation of Blodgett's criminal record may indeed be irrelevant. But the record simply does not permit this assessment now. To the extent that the district court's summary judgment ruling was based on its assumptions about the causes of the plaintiff's loss, it cannot stand.
 
 B. Defendants' Duty to Stedman
 
 62
 Of course, the district court cited alternate grounds for its decision to grant summary judgment in favor of the defendants. Thus, the court ruled that the Hoogendoorn firm could not be liable for breach of contract, negligent misrepresentation, or malpractice because it undertook solely to hire a private investigator to check into Blodgett and Morgan and to report that individual's findings to Stedman, which Tiesenga had done without omission. 843 F. Supp. at 1518. Willey himself could not be held liable for breach of contract or negligent misrepresentation, the court reasoned, because Tiesenga and his firm, not Stedman, had hired him and he owed no contractual obligation or duty of care to Stedman. Id. at 1523. These dual rulings strike us as potentially inconsistent. If, for example, the law firm's only responsibility was to hire someone else to conduct the investigation Stedman desired, then Stedman would seem to have a strong case to make for the notion that he was an intended third-party beneficiary of the contract between the firm and Willey. Conversely, if Willey was bound in contract and in tort solely to Tiesenga and the firm; then a case can be made for the notion that Willey should be treated as the firm's agent and that the firm did, in fact, owe some duty to Stedman beyond the mere hiring of Willey. The district court's more narrow view of what Hoogendoorn and Willey each undertook has the effect of relieving both of them of any material obligation to Stedman, despite the apparently undisputed fact that both Tiesenga and Willey acted with full awareness that a third party (i.e. Stedman) was to be the beneficiary of the investigation. See id. n.15. In any case, we need not confront the issue on the present record, for we believe that all of this was prematurely resolved. A material dispute of fact remains as to exactly what Stedman hired Tiesenga and his firm to do and what he understood that they would do.
 
 
 63
 As we noted earlier, Tiesenga and Stedman provided divergent accounts as to what they did or did not discuss vis a vis the hiring of a private investigator. Tiesenga insists that he told Stedman the firm would have to turn to an investigator to conduct the investigation (Tiesenga Dep. 19, 29), while Stedman's understanding was that the firm would take responsibility for the investigation, perhaps recruiting any individuals it might need to assist in that process (Stedman Dep. 19-20, 60, 85). The district court chose to credit Tiesenga's version, a determination which in turn supplied the basis for its conclusion that the Hoogendoorn firm had agreed simply to hire a private investigator, no more, and thus could not be held liable for any shortcomings in the investigation of Blodgett. Any limitations on Stedman's right to recover from either the firm or Willey were, in other words, the result of the way Stedman himself had "structured" the relationships among the parties. 843 F. Supp. at 1523. The court believed it appropriate to credit Tiesenga's recollection of the agreement over Stedman's because (1) even Stedman ultimately "backpedaled" from his assertion that Tiesenga was to conduct the investigation himself, when he acknowledged that it was up to Tiesenga and the Hoogendoorn firm "to choose the people, if they chose them" (Stedman Dep. at 60); (2) Stedman was hiring a Chicago lawyer to investigate a dealer located in Minnesota, and thus he should have understood that the firm would have to turn to someone else to handle the investigation; and (3) Stedman's insistence that the investigation was to focus primarily if not exclusively on the criminal background of Blodgett and Morgan, which the court independently found incredible, revealed an overall effort on Stedman's part to perform "reconstructive surgery to historical fact." Id. at 1515-16.
 
 
 64
 It was inappropriate for the district court to resolve this key factual dispute as it did. In order to assess the extent of Tiesenga's undertaking, the court had to choose which of two contradictory accounts to credit. This it could not permissibly do on summary judgment. True, it is sometimes appropriate to disregard fantastical assertions or those which are blatantly inconsistent with the other undisputed facts. See 10A Wright, Miller & Kane, supra, Sec. 2727, at 170; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 596, 106 S. Ct. 1348, 1356-57, 1361 (1986); Richardson v. Bonds, 860 F.2d 1427, 1433-34 (7th Cir. 1988). But when two individuals have given contradictory accounts of events of which they have personal knowledge, both of which are plausible, the decision as to which of them is correct must await trial before the factfinder; "summary judgment is not a procedure for resolving a swearing contest." Jackson v. Duckworth, 955 F.2d 21, 22 (7th Cir. 1992); see Wilson v. Williams, 997 F.2d 348, 350 (7th Cir. 993) (reversing grant of summary judgment based on credibility determinations); Cameron v. Frances Slocum Bank & Trust Co., 824 F.2d 570, 575 (7th Cir. 1987). And in this respect, Stedman's version of events does not strike us as inherently implausible.
 
 
 65
 First, we do not find in Stedman's reference to the prospect of Tiesenga and his firm "choos[ing] the people, if they chose them" any concession on Stedman's part that he understood the law firm would necessarily yield responsibility for overseeing the investigation to another party. Taken at face value, the remark seems to admit no more than the possibility that Tiesenga and the firm might recruit other individuals (within or without the firm) to aid in the investigation.
 
 
 66
 Nor does Stedman's selection of a Chicago law firm to investigate a Minnesota coin dealer compel the supposition that anyone in Stedman's position reasonably would have understood that the law firm would be unable to conduct or supervise the investigation itself. Given the extent to which an investigation of this nature is now conducted (and in this case, was conducted) by telephone and by computer, the extent to which the firm could or could not handle the investigation no doubt depended more upon its own resources and expertise than upon geography. Indeed, it is undisputed that the firm turned not to a Minnesota investigator, but first to a Chicago-area investigator and ultimately to one based in Wisconsin, who did his work entirely via wire. And, we point out, the firm did not remain detached from the investigation altogether. Tiesenga's March 26 confirmation letter to Willey directs him to "contact me to discuss and agree upon a scope and focus for your investigation." Willey Dep. Ex. 1. His preliminary letter to Stedman on the following day uses terms like "we" and "our" repeatedly in describing the progress of the investigation (Willey Dep. Ex. 7), and his final letter on March 29 reflects Tiesenga's own significant efforts to procure information for Stedman about the investment (Tiesenga Dep. Ex. 2).
 
 
 67
 Finally, we discern nothing unusual or inherently implausible in Stedman's after-the-fact insistence that he wanted the criminal background of Blodgett and Morgan checked above all else and that this was the task he presented to Tiesenga. Certainly it is true that Stedman has an incentive to recall events with a spin favorable to his legal claims; the same could be said of Tiesenga and Willey. But simply because Tiesenga's recollections are more detailed, and find support in his own handwritten notes (see 843 F. Supp. at 1514-15) does not mean that Stedman's contrary recollections may be discredited on summary judgment. Indeed, the confirmation letter that Tiesenga sent to Willey regarding the nature of the investigation is in many respects consistent with Stedman's recollection, emphasizing as it does that "[o]ur objective is to determine whether Blodgett, his company (Morgan) or any other company or affiliate has any negative history such as a bankruptcy, civil or criminal investigation, litigation, or conviction of any kind." Willey Dep. Ex. 1 (emphasis supplied). Likewise, Tiesenga's notes summarize Stedman's concern as being focused on whether there was "[a]nything sinister in [Blodgett's] background." Tiesenga Dep. 27, Group Ex. 1. In short, Stedman's account is not so fantastic or contrary to the agreed upon facts as to permit the court to credit Tiesenga's contrary recollections.
 
 
 68
 The district court's credibility assessments unfortunately infect its entire analysis of what each of the defendants agreed to undertake and the duties (if any) each owed to Stedman. As a result, the court's conclusions as to the asserted liability of Hoogendoorn and Willey to Stedman for breach of contract, negligent misrepresentation, and malpractice cannot be affirmed.
 
 
 69
 C. Failure to Check Hennepin County Court Records
 
 
 70
 We note finally that in assessing whether Willey and/or Hoogendoorn reasonably satisfied their respective duties with respect to the investigation, the district court gave minimal consideration to the failure to check the Hennepin County court records. As we have noted, Willey did explain why he did not attempt to review those records, and the district court accepted that explanation as reasonable, particularly in the context of the time constraints under which Willey was working. 843 F. Supp. 1512. The affidavit submitted by Stedman's subsequently-hired investigator may call Willey's explanation somewhat into question, although as the district court pointed out, that investigator's luck in searching the records may be explained by intervening changes in Minnesota policy and procedures. Id. at 1522 n.14.
 
 
 71
 Yet, even assuming that Willey could not have checked these records within whatever time and cost constraints were imposed on him, it must be considered whether his decision not to check those records should have been disclosed to Stedman. It is clear, after all, from Tiesenga's letter to Willey that Blodgett's criminal history was at the least an important factor that was to be investigated. Moreover, it is far from clear whether Tiesenga and Stedman reasonably understood the limits of the criminal check that Willey conducted. The prepared form on which Willey delivered his report, which contains a section at the start identifying the "Data Requested," indicates that a "[c]omplete personal profile" was called for. Willey Dep. Ex. 3. The ensuing summaries of Willey's contacts with the Minnesota State Police and Attorney General's office do not hint that these sources would reveal something less than the full extent of any criminal record Blodgett might have in Minnesota. And, finally, the conclusion of the report, which lists additional searches that Tiesenga and his client might consider, suggests nothing in the way of further checks into Blodgett's criminal background that might be possible or desirable if time and budget permitted. Thus, setting aside the feasibility of performing a more thorough investigation than Willey in fact performed, the question remains whether Stedman was adequately apprised of what sources had and had not been checked. This may prove irrelevant if, ultimately, the evidence establishes that the defendants provided Stedman with warnings apropos of the hazards that led to his loss and thus any defects in their investigation caused him no harm. We note the matter simply as one to be considered if it becomes necessary to evaluate once again whether Tiesenga or Willey breached any investigatory duty either may have owed to Stedman.
 
 III.
 
 72
 The lack of record development as to certain aspects of this case, coupled with the district court's credibility assessments, reveals the summary judgment ruling to have been erroneous. We must therefore vacate the judgment in favor of the defendants and remand for further proceedings consistent with this order. In view of the credibility assessments the judge below has already made, Circuit Rule 36 will apply and the case shall be reassigned to a different judge.
 
 
 73
 In the ordinary course of events, the vacatur of the summary judgment ruling would call for a trial. We leave that question to the district judge to whom the case is reassigned on remand. If, in consultation with the parties, the district court believes that one or more of the issues we have addressed, or any other potentially dispositive question, can be resolved on a second motion for summary judgment following any necessary discovery, then it is free to proceed in that fashion. We urge the parties in any future briefing to comply scrupulously with the requirements of Local General Rule 12(m) and (n). The defendant's failure to do so in this case (see 843 F. Supp. at 1514) no doubt made the district court's task much more difficult than it need have been, and it has needlessly complicated our review as well. See Waldridge, supra, 24 F.3d at 923-24. The parties shall bear their own costs on appeal.
 
 VACATED AND REMANDED
 
 
 *
 Of the Ninth Circuit, sitting by designation
 
 
 [2]
 [FOOTNOTE BY THE COURT] Stedman had considered insuring Blodgett's life given that Blodgett was brokering large investments for Stedman and frequently was required to travel internationally in the course of his work. Stedman Dep. 24
 
 
 [3]
 [FOOTNOTE BY THE COURT] Tiesenga had talked with Stedman at length the previous evening in order to convey the findings that were included in Willey's forthcoming written report, discussed infra
 
 
 [4]
 [FOOTNOTE BY THE COURT] Blodgett had been providing Stedman with monthly statements showing large purported increases in the value of the coins he had already purchased. Stedman Dep. 80-81
 
 
 [5]
 Stedman purchased the coins on behalf of himself in some instances and on behalf of family members in others. These individuals were named in the original complaint as additional plaintiffs, but were dismissed by the district court early on in the proceedings. That decision is not challenged on appeal
 
 
 [6]
 Tiesenga had not disclosed Stedman's identity to Willey. Tiesenga Dep. 34
 
 
 [7]
 For example, although Tiesenga testified that he told Stedman the investment sounded like a scam, he also emphasized that "it would not make any difference what Blodgett was like as a person because the market was not real." Hoogendoorn Br. at 22 (emphasis supplied) (citing Tiesenga Dep. 55)